**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

MARC LEWIS,

                         Plaintiff,

       v.                                  No. 12-CV-268
                                          (NAM/CFH)

MURPHY, Captain, Coxsackie Correctional
Facility; J. LEWIS, Corrections Counselor,
Coxsackie Correctional Facility; MATTHEWS,
Deputy Superintendent for Administration, Coxsackie
Correctional Facility; CHRISTOPHER
MILLER, Deputy Superintendent for Security,
Coxsackie Correctional Facility; ERIC G. GUTWEIN,
Commissioner Hearing Officer, N.Y.S., D.O.C.C.S.,

                            Defendants.

_____

**APPEARANCES:**                           **OF COUNSEL:**

MARC LEWIS
Plaintiff Pro se
95-A-2837
Wyoming Correctional Facility
Post Office Box 501
Attica, New York 14011

HON. ERIC T. SCHNEIDERMAN        JOSHUA E. McMAHON, ESQ.
Attorney General for the                 Assistant Attorney General
    State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Marc Lewis ("Lewis"), an inmate currently in the custody of the New York

_____

      [1] This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, five DOCCS employees, violated his rights under the Fourteenth Amendment. Compl. (Dkt. No. 1). Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 46. Lewis opposes and defendants replied. Dkt. Nos. 57, 61. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

The specific facts of the case are set forth in the Report-Recommendation and Order filed February 28, 2012, familiarity with which is assumed. See Dkt. No. 39 (Report-Recommendation); Dkt. No. 43 (Memorandum-Decision and Order). The facts are related herein in the light most favorable to Lewis as the non-moving party. At all relevant times, Lewis was an inmate at Coxsackie Correctional Facility ("Coxsackie").

## A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when non-party Correctional Officer Whit ("Whit") changed the channel on the television that Lewis was watching. Dkt. No. 46-9 at 2. Lewis wrote a letter to non-party Superintendent Martuscello ("Martuscello") complaining about the incident and stated that Whit harassed and intimidated him. Compl. ¶ 1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46-9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. Id. at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. #1 (Dkt. No. 46-6) at

2

43:8–14.  On November 7, 2011, Lewis was taken from his cell and told by non-party

Sergeant Martin that he was being placed under keeplock[2] status for threats Lewis made

against someone in the administration building.  Id. at 27:14–22.  At that time, Lewis had yet

to receive a copy of the misbehavior report.  Id. at 28:11–15.  Based on the content of the

November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe

and extort personnel.  Dkt. No. 46-9 at 1.


## B.  Tier III Disciplinary Hearing

On November 10, 2011, Lewis was escorted by non-party Correctional Officer

Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain

Murphy ("Murphy").  Lewis Dep. #1 at 34:8–12, 35:12–13.  Murphy started the recording,

explained the hearing process, and took Lewis's plea.  Id. at 35:17–22.  Lewis advised

Murphy that he had not been served with a copy of the misbehavior report and had not yet

been provided inmate assistance.  Compl. ¶ 4; Murphy Decl. (Dkt. No. 46-22) ¶ 8.  Murphy

attested that he immediately stopped the hearing and directed Stevenson to provide Lewis

with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate

assistance.  Murphy Decl. ¶¶ 8,11.  Lewis also objected to Murphy being the officer who

reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a

disciplinary hearing, and the hearing officer.  Id. ¶ 9.  According to DOCCS Directive 4932,

251-2.2(f) Murphy could not serve as both the reviewing and hearing officer on the same

misbehavior report.  Dkt. No. 46-12 at 4.  Lewis was then brought back to his cell to review

---

[2]  "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction.  Gittens v. Lefevre, 891 F.2d 38, 39 (2d Cir. 1989) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 251-1.6 (2012)).

the misbehavior report and receive inmate assistance.  Compl. ¶ 5.

### 1.  Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant.  Lewis Decl. (Dkt. No. 46-14) ¶ 4.  On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing.  Id. ¶ 7.  During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses and asked for the name of the review officer who authorized his keeplock confinement.  Id. ¶ 8; Lewis Dep. #1 at 40:8–16.  Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question.  Lewis Dep. #1 at 40:15–17; Dkt. No. 46-15.  Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home.  Compl. ¶¶ 7–8.  Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance form and Counselor Lewis left the cell at that time.  Id. ¶ 8.  Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges.  Lewis Decl. ¶ 9.

### 2.  Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time.  Dkt. No. 46-17; Compl. ¶ 10.  The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced.  Dkt.

No. 46-17.  Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10.  Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in court from November 14, 2011 to November 16, 2011.  Id.  Matthews attested that Lewis is mistaken about who wrote the report.  Matthews Decl. (Dkt. No. 46-16) ¶¶ 8–10.  Matthews explained that although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews.  Id.

Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer.  Dkt. No. 46-19.  Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter.  Miller Decl. (Dkt. No. 46-18) ¶ 7.  By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer.  Id.; Dkt. No. 46-20.

### 3.  Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time.  Dkt. No. 46-13.  On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis.  Hr'g Tr. (Dkt. No. 46-10) at 2.[3]  Lewis pleaded not guilty to the charges against him.  Id. at 3.  Lewis objected to:  (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being

---

[3]  The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests.  Id. at 4.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses.  Hr'g Tr. at 8.  Lewis also requested that the November 5, 2011 letter be produced as evidence.  Id.  Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence.  Id. at 8, 19.  Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance grounds as Lewis wanted them to testify to the defects of the disciplinary hearing.  Gutwein Decl. (Dkt. No. 46-8) ¶ 28; Hr'g Tr. at 19, 20.  Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for their testimonies would have been duplicative.  Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report.  Hr'g Tr. at 9.  Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be."  Id.  Lewis was afforded an opportunity to direct questions at Martin through Gutwein.  Id.  Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report.  Id. at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing

the whistle on the wrong doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history.  Hr'g Tr. at 20.  Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"),[4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits.  Id.  Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future.  Gutwein Decl. ¶ 12.

### C.  SHU conditions

On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven months.  Compl. ¶ 39.  Nevertheless, Lewis was able to complete this program after his release from SHU.  Lewis Dep. #1 (Dkt. No. 46-6) at 69:7–14.

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant.  Lewis Dep. #2 (Dkt. No. 46-7) at 12:6-11.  Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it.  Id. at 12:3–5, 13:2–3.  By the time Lewis was

---

[4]  SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

released from SHU, his sister had received a transplant.  Id. at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU.  Compl. ¶ 46.  Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week.  Dkt. No. 57 at 15–16.  Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee.  Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer.  Id. at 16.

### D.  Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition.  Compl. ¶ 34.  Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate."  Dkt. No. 46-21.  Lewis appealed to non-party Albert Prack, the director of the Special Housing/Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence used fails to provide enough information to support the charges."  Dkt. No. 57 at 49.  Therefore, after sixty-nine days, Lewis was released from the SHU.  Compl. ¶ 45.

### II.  Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights

8

by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy, and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety.  Defs.' Mem. of Law (Dkt. No. 46-2) at 3.  Defendants specifically move for summary judgment on the grounds that:  (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity.  Id.  Additionally, Matthews moves for summary judgment for lack of personal involvement.  Id.

## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se litigant's
> submissions must be construed "liberally,". . . and that such
> submissions must be read to raise the strongest arguments that
> they "suggest," . . . .  At the same time, our cases have also
> indicated that we cannot read into pro se submissions claims
> that are not "consistent" with the pro se litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by
> pro se litigants," . . . and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion;

the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at

247–48.

## B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[5] Assertions of personal involvement that are merely speculative are

---

[5] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

insufficient to establish a triable issue of fact.  See e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request.  Lewis contends that Matthews filed a Tier III hearing extension form that falsely indicated Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10.  Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him.  Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office.  Therefore, Matthews did not participate directly in the alleged constitutional violation.  Matthews Decl. (Dkt. No. 46-16) ¶ 10; Dkt. No. 46-17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed.  Matthews Decl. (Dkt. No. 46-16) ¶ 11.  Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate indifference to Lewis's rights by failing to act on information indicating that unconstitutional acts were occurring because Matthews had no information indicating that any wrong was occurring.  Matthews also attested that he had no supervisory role over Coxsackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the continuation of a policy or custom under

12

which unconstitutional practices occurred.  Matthews Decl. ¶ 2.  Lastly, since Matthews held

no supervisory authority over the inmate disciplinary program, he could not have been

grossly negligent in supervising subordinates who committed the allegedly wrongful acts.

Id.  Lewis points to no evidence in the record to substantiate his assertions that Matthews

created the extension request.  Moreover, Lewis testified in his deposition and indicated in

his response papers that he voluntarily withdraws his claims against Matthews.  Lewis Dep.

#2 (Dkt. No. 46-7) at 28; Resp. (Dkt. No. 57) at 9.  It is fair to conclude that a rational finder

of fact would determine that these assertions are merely speculative and therefore, Lewis

cannot establish the personal involvement of Matthews in the alleged unconstitutional

actions.

Accordingly, defendants' motion on this ground should be granted.


## C.  Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . .

deprive any person of life, liberty, or property without due process of law."  U.S. CONST.

amend. XIV § 1.  It is important to emphasize that due process "does not protect against all

deprivations of liberty.  It protects only against deprivations of liberty accomplished without

due process of the law."  Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation

and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may

arise from an expectation or interest created by state laws or policies."  Wilkinson v. Austin,

545 U.S. 209, 221 (2005) (citations omitted).  An inmate retains a protected liberty interest

in remaining free from segregated confinement if the prisoner can satisfy the standard set

forth in <u>Sandin v. Conner</u>, 515 U.S. 472, 483–84 (1995).

## 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection.  <u>See</u> <u>generally</u> <u>Valmonte v. Bane</u>, 18 F.3d 992, 998 (2d Cir. 1994) ("[Procedural] due process questions [are analyzed] in two steps:  the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing <u>Kentucky Dep't of Corr. v. Thompson</u>, 490 U.S. 454, 460 (1989)).  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  <u>Vasquez v. Coughlin</u>, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).  This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life.  <u>See</u> <u>Jenkins v. Haubert</u>, 179 F.3d 19, 28 (2d Cir.1999); <u>Frazier v. Coughlin</u>, 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality.  <u>Colon v. Howard</u>, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights."  <u>Palmer v. Richards</u>, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).  Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate

14

duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." Id. at 64–65 (citing Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. Id. (citing Colon, 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] . . . unusual conditions." Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing inter alia Palmer, 364 F.3d at 65–66).[6]

Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. Palmer, 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated

_____

[6] All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

15

confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an opportunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer.[7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

> placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

Colon, 215 F.3d at 230; see also N.Y. COMP. CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement. Vasquez, 2 F. Supp. 2d at 259; Frazier, 81 F.3d at 317 (explaining that while prisoners in SHU may be

_____

[7] Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); see also Alvarado v. Halle Hous. Assoc., 152 F. Supp. 2d 355, 355 (S.D.N.Y. 2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet Sandin requirements).

Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. See Long v. Crowley, No. 09-CV-456(F), 2012 WL 1202181, at *11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); Borsock v. Early, No. 03-CV-395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT) (finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; Thompson v. LaClair, No. 08-CV-37 (FJS/DEP), 2009 WL 2762164, at *8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship); Deutsch v. U.S., 943 F. Supp. 276, 280 (W.D.N.Y. 1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. #1 at 69:7–14.

17

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities.  Sealey v. Coughlin, 997 F. Supp. 316, 321 (N.D.N.Y. 1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); Edmonson v. Coughlin, 21 F. Supp. 2d 242, 249, 250 (W.D.N.Y. 1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship.  Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week.  Dkt. No. 57 at 15–16.  Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells."  Id.

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship.  See Davidson v. Murray, 371 F. Supp. 2d 361, 364, 369 (W.D.N.Y. 2005) (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); McNatt v. Unit Manager Parker, No. 99-CV-1397 (AHN), 2000 WL 307000, at *4, *8 (D. Conn. Jan. 18, 2000) (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not

18

constitute a constitutional violation of due process); <u>Bolton v. Goord</u>, 922 F. Supp. 604, 630 (S.D.N.Y. 1998) (finding double-celling of inmates is not considered an atypical and substantial hardship).  Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest.  <u>See</u>, <u>e.g.</u>, <u>Welch v. Bartlett</u>, 196 F.3d 389, 393 (2d Cir. 1999) (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation).  Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement.  Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

**2.  Procedural Due Process**

Defendants argue that Lewis was afforded ample due process.  While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process.  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974).  A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken."  <u>Sira v. Morton</u>, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

### a. Written Notice

In this case, Lewis received proper written notice.  An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the disciplinary hearing commences.  <u>Wolff</u>, 418 U.S. at 563–64.  Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." <u>Id.</u> at 564.  When Lewis was brought to the hearing before Murphy on November 10, 2011, Lewis had not yet received written notice of the charges.  Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately.  Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis.  Murphy Decl. ¶ 16.  Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day.  On November 21, 2011, Gutwein took over  Lewis's Tier III disciplinary hearing.  Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011.  Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date.  As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.


### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses

and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992). With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

As for witnesses, Gutwein permitted Martin to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. Id. ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." Rivera v. Wohlrab, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002). Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis

21

wanted to ask.  Hr'g Tr. at 9–18.  A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished.  Id.  As such, Lewis was provided an opportunity to call witnesses and present documentary evidence.  Sira, 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.


### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats.  Prisoners have a constitutional right to a fair and impartial hearing officer.  See, e.g., Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004).  However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts."  Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted).  The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . " and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt."  Luna v. Pico, 356 F.3d 481, 487–88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

As discussed supra, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity."  Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir. 1992).  Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain

22

evidence.

Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. See generally Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. Id. at 6. Gutwein's determination was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On

November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. Id.; Dkt. No. 46-11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. Sira, 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.


### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." Neree v. O'Hara, No. 09-CV-802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. Id. (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. Lewis v. Johnson, No. 08-CV-482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5. 2010) (citing Silva, 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.'" Clyde v. Schoellkopf, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (citing Pilgrim v. Luther, 571 F.3d 201, 206 (2d Cir. 2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46-12 at 5; N.Y. COMP. CODES R. & REGS. tit 7 § 251-4.1(a)(4).

Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview

potential witnesses. Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46-17. Gutwein had also denied Lewis's request for the definitions of threats, bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. Clark v. Dannheim, 590 F. Supp. 2d 426, 429–31 (W.D.N.Y. 2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. See generally Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." Id. at 9. Lewis then asked "did I—anything of value to or from—Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. Id. at 10. Lastly, Lewis asked "did I give or attempt to give—money, gifts,—or anything worth—value . . . to . . . Superintendent Martuscello and—or—administrator . . . ." This demonstrates that Lewis had an understanding of what bribery meant. Id. at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure

prejudiced him as a result.  Therefore, any shortcomings in the assistance rendered by

Counselor Lewis was harmless error and does not rise to the level of a due process

violation.  Hernandez v. Selsky, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (plaintiff failed to

show how outcome of hearing would have been different had employee assistant

interviewed witnesses, and thus any alleged inadequate assistance was harmless error not

warranting denial of summary judgment).  Additionally, even though Gutwein failed to

provide an explanation of the charges, Lewis was not prejudiced as a result because

Gutwein described in his hearing disposition the evidence he relied upon to determine that

Lewis was guilty.  An explanation of these charges to Lewis would not have changed the

evidence which Gutwein had relied upon.  As such, Lewis's due process claim based on

inadequate inmate assistance must fail.

Accordingly, defendants' motion for on this ground should be granted.


## f.  Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011

misbehavior report was not commenced in a timely manner because his hearing did not

begin until November 21, 2011.  Where an inmate is confined pending a disciplinary

hearing, the hearing must commence within seven days of his initial confinement and

conclude within fourteen days of the writing of the misbehavior report.  N.Y. COMP. CODES R.

& REGS. tit. 7 § 251-5.1(a)(b);[8] Dkt. No. 46-12 at 5–6.  The Commissioner of Correctional

---

[8]  Section 251-5.1, states that

　　　(a) Where an inmate is confined pending a disciplinary hearing
　　　or superintendent's hearing, the hearing must be commenced

26

Services or his designee must authorize any delay beyond those time limits. N.Y. COMP. CODES R. & REGS. tit. 7 § 251-5.1(a)(b); Dkt. No. 46-12 at 5–6.

Lewis's Tier III hearing was timely commenced. Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November 18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46-13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46-13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46-13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

_____

as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

(b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

(c) Violation hearings must be completed within seven days of the writing of the misbehavior report.

N.Y. COMP. CODES R. & REGS. tit. 7 § 251-5.1.

Accordingly, defendants' motion on this ground should be granted.

## D.  Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process.  To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal.  Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  Conclusory, vague, and general allegations are insufficient to support a conspiracy claim.  Ciambriello, 292 F.3d at 325.  Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal.  Warren v. Fischl, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy.  Lewis Dep. #2 at 1-8; Gutwein Decl. ¶ 39; Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11.  Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights.  Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer.  Murphy stated that he stopped the hearing once he realized that Lewis had not received a copy of the misbehavior report.  Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer.  Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed <u>supra</u>, there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." <u>Nassau Cnty. Employee "L" v. Cnty. of Nassau</u>, 345 F. Supp. 2d 293, 304 (E.D.N.Y. 2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. <u>Id.</u> Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. <u>Id.</u>; <u>see</u> <u>also</u> <u>Everson v. New York City Transit Auth.</u>, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002) (collecting cases). This doctrine would therefore exclude conspiracy claims against employees of DOCCS working within the scope of their employment. <u>Hartline v. Gallo</u>, 546 F.3d 95, 99, n.3 (2d Cir. 2008) (citations omitted); <u>Little v. City of New York</u>, 487 F. Supp. 426, 441–42 (S.D.N.Y. 2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." <u>Nassau Cnty. Employee "L"</u>, 345 F. Supp. 2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. <u>Everson</u>, 216 F. Supp. 2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.


### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the

constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236

F. Supp. 2d at 230.

Here, the second prong of the inquiry need not be addressed with respect to Lewis's

Fourteenth Amendment and conspiracy claims against the defendants because, as

discussed supra, it has not been shown that defendants violated Lewis's Fourteenth

Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.


## III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

summary judgment (Dkt. No. 46) is **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen

(14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c)

(citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d

85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  June 27, 2014
        Albany, New York

*Christian F. Hummel*

Christian F. Hummel
U.S. Magistrate Judge